# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **In Re:** | ) | |
| RISSI INEZ PALMER | ) | CASE NO. 09-01890 |
|     Debtor | ) | Chapter 7 |
| | ) | Hon. George C. Paine, II |
| 1720 ENTERTAINMENT LLC | ) | |
|     Plaintiff | ) | |
| | ) | |
| v. | ) | Adv. Proc.: 09-0226A |
| | ) | |
| RISSI INEZ PALMER | ) | |
|     Defendant. | ) | |

—————————————————

## MEMORANDUM

—————————————————

This matter is before the court on 1720 Entertainment Inc.'s motion to dismiss Rissi Inez Palmer ("debtor") chapter 7 bankruptcy pursuant to 11 U.S.C. § 707(a) and/or 707(b). In the alternative, 1720 seeks to deny the debtor's discharge pursuant to 11 U.S.C. §§ 727(a)(2), 727(a)(4) and 727(a)(5). For all the reasons stated herein, the court denies 1720's Motion to Dismiss, and dismisses 1720's adversary proceeding seeking to deny the debtor's discharge. The following constitutes that court's findings of fact and conclusions of law.

## I. FACTS

In 2005 Rissi Palmer was a young, aspiring country music artist. In July of that year, Palmer met with Terry Johnson, president of 1720 Entertainment. Although Johnson had very limited experience in the music industry, 1720

undertook to promote Palmer's career.[1]  Palmer testified, and Johnson reaffirmed, that from the beginning, it was understood that 1720 would try to partner with a major record labor to launch Palmer's career. Palmer and 1720 entered into an "Exclusive Recording Artist Agreement" dated as of July 19, 2005, and later an Exclusive Songwriting and Co-Publishing Agreement" dated March 15,2007 as well as an "Exclusive Management Agreement" dated July 21, 2007.

The Artist Agreement and Songwriter's Agreement provide, among other things, that in exchange for Debtor's agreement to provide her exclusive services as a recording artist, composer, and songwriter, 1720 will advance funds to the Debtor.  Upon the occurrence of certain events, 1720 is then entitled to "recoup" or recover the advances made to the debtor.[2]  1720 was advancing funds to Palmer for living expenses in the amount of $3,250 per month through December 2008, at which time, payments increased to $4,030 per month.

From 2005 through 2009, 1720 attempted to promote the debtor's career, and advanced $2,710,623.36 in expenses for "Advertising/Promotion," "Artist Development," "Marketing," "Musicians/Contract Labor," "Product Development," "Tour Support," and "Video Production."  In November 2006, the debtor and Mr. Johnson began having a romantically involved relationship.  He began giving her jewelry most of which was costume in nature, but he did give her a

---

[1] Mr. Johnson testified at trial that he had only worked in the music business for about a year when 1720 signed Palmer.  He had previously worked in the automotive parts industry.

[2] In other words, 1720 paid to "groom" Palmer as a country music artist by advancing sums of money to pay expenses to promote her career.  All advances, however, were fully "recoupable" by 1720 under the contract.

Page 2

diamond/gold/platinum necklace for Christmas in 2006 that he purchased for about $7,000. In the meantime, Palmer worked on and eventually finished her first album which was released in the fall of 2007. Her album to date has sold about 25,000 copies allowing 1720 to recoup approximately $177,873.24 from the Debtor.[3]

The agreements with 1720 allowed 1720 to recoup as follows:

| | |
|---|---|
| Touring Revenue: | 1720 gets a 10% of revenue |
| Merchandising: | 1720 gets 50% split |
| Endorsements: | 1720 gets 10% split |
| Publishing Advances: | 1720 gets 50% split after the publishing recoupment of base ($110,000), and then start sharing profits. |

The debtor testified that while she was touring, she could meet her basic expenses because of the extra money coming in. However, after the first album sales did not produce as the parties hoped, the debtor began pushing to make a second album while partnered with a major label. By the fall of 2008, 1720 had not acted on her option to put out a second record (which would have brought an immediate advance of approximately $41,000), and the debtor felt 1720, despite its best efforts, had taken her career as far as it could.[4]

---

[3]Under the Artist Agreement, the Debtor is entitled to share in 30% of 1720 Entertainment's net profits with respect to Debtor's recordings. With advances of over $2.7 million, there was no real prospect for any share of net profits especially in light of the meager sales of the debtor's first album. Recoupment can come from album sales, single downloads, ringtones, answer tones, streaming revenue from internet, mobile revenue, digital revenue.

[4] The debtor testified that 1720 had forgotten her second option and she sent a note to get them to do it. She was told that 1720 was not going to do a second album, but instead re-release her first album with some new singles. This meant the debtor was not entitled to the $41,000.00.

Palmer drove to Atlanta to meet with Terry Johnson to ask if some accommodation could be reached so that she could make a second album in partnership with a major record label. According to Ms. Palmer's credible testimony, Mr. Johnson seemed open to the idea of compromise by Palmer and 1720 to get her signed with a major label. Ms. Palmer explained, however, that when her lawyers contacted 1720 lawyers to work out some arrangement, no agreement was reached and the relationship between Palmer and 1720 became very strained.[5]

By the end of 2008, Palmer had only one engagement scheduled and was no longer touring. She had medical issues stemming from swollen vocal cords that required rest. Medical bills for treatment of her vocal cords had gone into collection. She no longer had tour revenue coming in and could no longer meet even her most basic needs. In an attempt to get some cash, Ms. Palmer sold two gold bracelets (given to her by her paramour, Mr. Johnson) and used that money for food, gas and bills. Her landlord had begun eviction proceedings against her for failure to pay her rent. The debtor settled her detainer action by paying her back rent but she was forced to move out her apartment.

The debtor was not making any significant income, but had accumulated significant debt. In addition to the advances made on her behalf by 1720, the Debtor, at 1720's urging, borrowed more than $90,000.00 from SunTrust Bank in

---

[5]Palmer testified that the October 2008 meeting went so well that she and Mr. Johnson went out to dinner afterwards. Mr. Johnson admitted in his testimony that he initially indicated a willingness to work with Palmer, but at the same time knew that any deal which would treat 1720 "fairly" was highly improbable.

Page 4

June 2006 to fund a settlement with her previous management company.[6] In late 2008 and early 2009 SunTrust Bank began setting off amounts owed to it against amounts in the Debtor's SunTrust Bank checking account. Realizing that her fledgling music career had become stagnated and given the prospect of paying all of the advances made by 1720 in addition to the amounts borrowed from SunTrust Bank as well as her other living expenses, the Debtor decided to file bankruptcy on February 20, 2009.

In July 2009, Palmer moved to Ohio and moved in with her parents. Her parents and grandparents loaned her money to keep her car and car insurance and she began working at a retail clothing store. Her income was approximately $600 per month but she recently received a promotion and now receives approximately $1200 per month. The debtor's unrebutted testimony was that even if 1720 had given her the $41,000 to make the second album, she would not have had enough money to cover her living expenses and bills. Even while living with her parents now, Ms. Palmer has about $100 per month after paying for groceries, gas, car insurance and her car note.

Shortly after the filing, 1720 filed a motion to dismiss her case under Bankruptcy Code sections 707(a) and (b). 1720 contends that the Debtor's

---

[6]The debtor's unrebutted testimony was that 1720 strongly encouraged the debtor to take out the Suntrust loan, which Terry Johnson personally guarantee even though her lawyers told her not to. The debtor signed the loan and thought that 1720 was going to pay back the loan. Instead, 1720 added the money she owed by increasing her monthly advance so that the money could be recouped. Thus, after personally guaranteeing the SunTrust loan, Johnson had 1720 advance the money to Palmer so it could be recouped all the while reducing his personal exposure on the loan.

Page 5

bankruptcy case was not filed in good faith, but rather filed in an attempt to evade her contractual obligations with 1720.  In addition, 1720 has filed an adversary proceeding objecting to the Debtor's discharge under Bankruptcy Code section 727(a). 1720 contends that the Debtor failed to schedule a "diamond/platinum/gold necklace" gifted to the Debtor by Terry Johnson, and failed to disclose the sale of two gold bracelets shortly before the Petition Date.

The Debtor contends that any omissions or mis-statements made were not fraudulent or intentional. The Debtor acted quickly to amend her schedules and statement once she was reminded of the diamond/platinum/gold necklace and the sale of two gold bracelets.  The court consolidated both issues for trial.

## II. 707(a) AND (b) MOTION

### A.    Section 707(a)

In Chapter 7 bankruptcy cases, any party in interest may move to dismiss the case pursuant to 11 U.S.C.A. § 707(a) "for cause."  In the Sixth Circuit, the "for cause" language of § 707(a) includes a lack of good faith in filing the bankruptcy case. **Indus. Ins. Servs., Inc. v. Zick (In re Zick)**, 931 F.2d 1124, 1126-27 (6th Cir.1991).  Even though the Bankruptcy Code does not explicitly state that a Chapter 7 debtor must file in good faith, this concept is implicit in the basic purpose of bankruptcy relief to relieve the honest but unfortunate debtor of his indebtedness so that he may make a fresh start. **Zick**, 931 F.2d at 1129 (citations omitted). "Good faith and candor are necessary prerequisites to obtaining a fresh start." **Id**. (**quoting McLaughlin v. Jones (In re Jones)**, 114 B.R. 917, 926 (Bankr. N.D.Ohio 1990)); **In re Eddy,** 288 B.R. 500, 504 (Bankr. E.D. Tenn., 2002).

When deciding whether to dismiss a case for lack of good faith, the court must examine the facts of that particular case and focus on a totality of the circumstances. **In re Stump**, 280 B.R. 208, 214 (Bankr. S.D. Ohio 2002); **In re Spagnolia**, 199 B.R. 362, 365 (Bankr. W.D. Ky. 1995). Dismissal should be reserved for only the most egregious cases. **Zick**, 931 F.2d at 1129; **Stump**, 280 B.R. at 214. Factors to be considered when making such a determination include the following:

| | FACTOR | Present in this Case, and Court's Finding |
|---|---|---|
| 1. | The debtor reduced his creditors to a single creditor in the months prior to filing the petition. | Not present in this case. |
| 2. | The debtor failed to make lifestyle adjustments or continued living an expansive or lavish lifestyle. | Not present in this case. |
| 3. | The debtor filed the case in response to a judgment[,] pending litigation, or collection action; there is an intent to avoid a large single debt. | Not present in this case. While the result of the debtor's filing results in 1720's large debt being discharged, the court cannot find that the debtor used chapter 7 only to avoid 1720's debt. |
| 4. | The debtor made no effort to repay his debts. | Not present in this case. |
| 5. | The unfairness of the use of Chapter 7. | Not present in this case. |
| 6. | The debtor has sufficient resources to pay his debts. | Not present in this case. |

Page 7

| 7. | The debtor is paying debts to insiders. | Not present in this case. While the debtor testified that she wants to repay her grandmother for loans for living expenses, this appears to have occurred post-petition. |
|---|---|---|
| 8. | The schedules inflate expenses to disguise financial well-being. | Not present in this case. |
| 9. | The debtor transferred assets. | Not present in this case. |
| 10. | The debtor is over-utilizing the protection of the [Bankruptcy] Code to the unconscionable detriment of creditors. | Not present in this case. |
| 11. | The debtor employed a deliberate and persistent pattern of evading a single major creditor. | Not present in this case. In fact, the debtor, in late 2008 and early 2009 tried to work with 1720 to make arrangements that would be fair to her and 1720. |
| 12. | The debtor failed to make candid and full disclosure. | While the debtor did fail to disclose a necklace and the pre-petition sale of two gold bracelets, the chapter 7 trustee testified that the debtor cooperated with him fully and she amended her schedules promptly. The chapter 7 trustee said her actions did not affect his timely administration of the estate. |
| 13. | The debts are modest in relation to assets and income. | Not present in this case. |
| 14. | There are multiple bankruptcy filings or other procedural "gymnastics." | Not present in this case. |

**In re Eddy,** 288 B.R. 500, 504 (Bankr. E.D. Tenn., 2002) (**citing Spagnolia**, 199

Case 3:09-ap-00226   Doc 25   Filed 11/24/09   Entered 11/24/09 09:52:19   Desc Main
Document      Page 8 of 16

B.R. at 365).

The court found meager proof to support a 707(a) bad faith dismissal.  As the Sixth Circuit advised in **Zick**, dismissal for bad faith is reserved for the most egregious cases.  The court found no bad faith inferred from this debtor's actions. Her testimony was truthful that she felt like she would be in indefinite servitude to 1720 owing more than $2.7 million in recoupment advances following only marginal success of her first album; her medical bills were in collection; the loan to Suntrust was in default; she was facing eviction from her apartment, and she was struggling to pay her car note and car insurance, and other living expenses.  This was a debtor in need of a fresh start, not a debtor acting in bad faith trying to escape 1720 to make break into stardom by another route.[7]  Accordingly, the court DENIES 1720's Motion to Dismiss pursuant to 11 U.S.C. § 707(a).

### B.      Section 707(b)

---

[7]As this court noted in a similar case, **In re McCready**, Case No. 97-04528, Oct. 28, 1997, Docket Number 58:

> Although the debtor may have better than an average chance of
> fame in the country music industry, there is no guarantee.  In a
> business as tough as the county music industry, a better than
> normal chance of stardom does not convince the court that this
> debtor knew that she was about to make it big and filed bankruptcy
> only to reap the rewards of her success while denying others their
> legal right to share in her success.

This is even more true for Ms. Palmer who is perhaps less well known that Mindy McCready was at the time this court denied a motion to dismiss her case.  Whie the court makes no claim to being prescient, Ms. McCready's career has been in a tailspin ever since her bankruptcy.

Under § 707(b)(1), the Court "may dismiss a case filed by an individual debtor under [Chapter 7] whose debts are primarily consumer debts … if it finds that the granting of relief would be an abuse of the provisions of [Chapter 7]." 11 U.S.C. § 707(b)(1). The Bankruptcy Code defines consumer debt as "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8). In considering whether the granting of relief would be an abuse under the provisions of Chapter 7 in a case where the presumption of abuse does not arise or is rebutted, the Court shall consider whether the debtor filed the petition in bad faith, or whether the totality if the circumstances of the debtor's financial situation demonstrates abuse. 11 U.S.C. § 707(b)(3).

As indicated by the unrebutted testimony of the debtor concerning her debts, the debtor's Statements and Schedules, and 1720's own proof of claim, the debtor's case cannot be dismissed under section 707(b) because her debts are not primarily consumer debts. Most all of the debts, including the over $2.7 million owed to 1720, and the $90,000 SunTrust loan are business debts, not consumer debts. Accordingly, the court DENIES 1720's Motion to Dismiss pursuant to 11 U.S.C. § 707(b).

### III. SECTION 727(a)(2), (a)(4) and (a)(5)[8]

Very recently, Chief Bankruptcy Judge David Kennedy of the Western District of Tennessee wrote an excellent opinion discussing the gravity of section 727:

---

[8] The Pretrial Order indicates the issues at trial are 727(a)(3), (a)(4), and (a)(5). However, the complaint and pretrial brief of 1720 indicate that 1720 was proceeding under (a)(2) instead of (a)(3). The court, therefore, addresses 1720's (a)(2) allegations and assumes that the (a)(3) in the Pretrial Order was merely a mistake.

Page 10

The denial of a debtor's discharge is a harsh outcome; therefore, the provisions set forth in 11 U.S.C. § 727(a) are precisely drawn so as to encompass only those individual debtors who have not been honest and forthcoming about their financial affairs. **See, e.g., Buckeye Retirement Properties v. Tauber (In re Tauber)**, 349 B.R. 540, 545 (Bankr. N.D.Ind. 2006) ("The denial of a debtor's discharge is akin to financial capital punishment. It is reserved for the most egregious misconduct by a debtor."). Indeed, the denial of a general discharge can work a serious deprivation upon a debtor, and there are many circumstances where a debtor's acts and omissions may have been inadvertent or otherwise excusable. Thus, the provisions of § 727(a) are to be construed liberally in favor of granting debtors the fresh financial start contemplated by the Bankruptcy Code and the Supreme Court, and construed strictly against parties seeking to deny the granting of a debtor's discharge.

**In re Jarrett**, ___ B.R. ___, 2009 WL 3379027, 2 (Bankr. W.D.Tenn. Oct. 21, 2009).

## A.    Section 727(a)(2)

11 U.S.C. § 727(a)(2)(A) and (B) read in pertinent part:

(a) The court shall grant the debtor a discharge, unless-

....

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed-

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition.

In **Buckeye Retirement Co., LLC, LTD. v. Swegan (In re Swegan)**, 383 B.R. 646, 655 (6th Cir. (BAP) 2008), the Sixth Circuit BAP defined the term "concealed" in § 727(a)(2) to include "the withholding of knowledge of an asset by the failure or refusal to divulge information required by law to be made known." **In re Swegan**, 383 B.R. at 655. The court may infer fraud from the circumstances of the material misrepresentation or an omission the debtor knew would "create an erroneous impression." **In re Beckham** , 2009 WL 1726526, 6 (6th Cir. (BAP)

Page 11

2009) (**citing Keeney v. Smith (In re Keeney), 227 F.3d 679, 683 (6th Cir.2000))**. "However, a debtor is entitled to discharge if false information is the result of mistake or inadvertence." **Id.**

1720 alleges that the debtor's failure to disclose the diamond necklace and the prepetition sale of the two gold bracelets amounts to sufficient justification to impose the "financial death penalty" of denial of a discharge. This court cannot agree.

The court found Ms. Palmer to be credible witness and found a total absence of fraud in her words and actions and unintentional omissions. She explained that she misunderstood the need to reveal the sale of the bracelets to her attorney and that the necklace she considered a gift that she wanted to return to Mr. Johnson for sentimental reasons stemming from their intimate relationship. She testified that she did not mean to omit or mislead anyone and that her omissions were simply a mistake. The court accepts this testimony.

Further reason for believing Ms. Palmer is supplied by Mr. Johnson. 1720 complains that the debtor did not reveal the existence of the jewelry in the petition, nor at the meeting of creditors, nor during a 2004 exam. It was only after Mr. Johnson told the trustee about the jewelry when the debtor tried to return it to him did the debtor amend her schedules. The court finds it ironic that it was Mr. Johnson, who had been in an intimate relationship with Ms. Palmer and gave her the jewelry would complain about the jewelry not being disclosed. Mr. Johnson attended Ms. Palmer's meeting of creditor and also a 2004 exam of Ms. Palmer but did not mention the jewelry. It was only when Ms. Palmer took the jewelry to Mr. Johnson to return it to him did the omission of the jewelry become a strategy for

1720 to deny the debtor's discharge to possibly recoup their advances.

In addition, the chapter 7 trustee testified that the debtor's omissions and amendments to her petition did not materially affect his timely administration of this debtor's estate. In fact, the trustee's agent who attempted to resell the jewelry received offers of only $1,800 to $2,000. This amount, according to the trustee's agent's testimony, did not even meet the minimum amount that would make the sale worthwhile to the estate. The jewelry therefore remains unsold and held by the trustee.

The court finds the allegations seeking the harsh remedy of denial of the debtor's discharge are too anemic. The court, therefore, DISMISSES 1720's adversary proceeding seeking to deny the debtor's discharge pursuant to 11 U.S.C. § 727(a)(2).

### B. Section 727(a)(4)

11 U.S.C. § 727(a)(4)(A) bars discharge if a debtor knowingly and fraudulently made a false oath or account in connection with a bankruptcy case. A knowingly and fraudulently made false oath or account bars discharge in bankruptcy, if it is both material and made with an intent to defraud. **In re Jarrett**, ___ B.R. ___, 2009 WL 3379027, 2 (Bankr. W.D. Tenn. Oct. 21,2009). To prevail, the plaintiff must prove by a preponderance of the evidence that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) that the statement related materially to the bankruptcy case. **Keeney v. Smith (In re Keeney)**, 227 F.3d 679, 685 (6th Cir.2000). Whether a

Page 13

debtor has made a false oath or account under § 727(a)(4)(A) is a question of fact. **Id**.

1720 objects to the debtor's discharge under (a)(4) because the debtor failed to disclose the jewelry and sale of the bracelets. The court found no credible evidence of fraud, and no evidence that the debtor intentionally made false statements or omissions. The chapter 7 trustee specifically testified that the debtor's actions and omissions did not materially affect the administration of the debtor's bankruptcy case.[9] For all the same reasons that the court dismissed 1720's § 727(a)(2) count, the court likewise DISMISSES 1720's adversary proceeding under § 727(a)(4).

### C. Section 727(a)(5)

Under § 727(a)(5), a court shall grant a debtor a discharge unless "the debtor has failed to explain satisfactorily ... any loss of assets or deficiency of assets to meet the debtor's liabilities[.] " Again, Judge Kennedy explains:

> In order to obtain a denial of discharge under § 727(a)(5), the plaintiff must first establish by a preponderance of the evidence a loss or deficiency of prepetition assets that could have been used to pay creditors. **In re Reed**, 310 B.R. 363, 369 (Bankr. N.D. Ohio 2004). If such a showing is made, the debtor has an opportunity to explain the whereabouts of the assets. **Id**. At its root, a satisfactory explanation is "one that is reasonable under the circumstances." **Id**. **See also In re Chalik**, 748 F.2d 616, 619 (11th Cir.1984) ("To be satisfactory, an explanation must convince the judge."). As long as the debtor's explanation is convincing and not rebutted, there is no need for documentary corroboration. **In re Cromer**, 214 B.R. 86, 97 (Bankr.

---

[9] The trustees in this district pursue denial of discharge actions aggressively when debtors abuse the bankruptcy process. The Chapter 7 Trustee made a decision not to pursue denial of the debtor's discharge. The trustee's decision not to pursue this debtor carried weight and further supports this court's findings.

Page 14

E.D.N.Y. 1997). When deciding whether a debtor's explanation is satisfactory, "the issue is whether the explanation satisfactorily describes what happened to assets; not whether what happened to assets was proper." **In re Perry**, 252 B.R. 541, 550 (Bankr. M.D.Fla. 2000); **see also In re Tauber**, 349 B.R. 540, 564 (Bankr. N.D.Ind. 2006) (stating that, for purposes of § 727(a)(5), "the debtor does not need to justify the wisdom or prudence in the disposition of assets").

**In re Jarrett**, ___ B.R. ___, 2009 WL 3379027, 2 (Bankr. W.D.Tenn. Oct. 21,2009).

1720 asserts that the debtor's omission of the jewelry and the sale of the bracelets warrants denial of her discharge under section (a)(5).[10] The court finds Ms. Palmer's testimony convincingly and  satisfactorily explained the sale of the bracelets and the omission of the necklace.  For this reason and all the reasons that the court denied 1720's counts under § 727(a)(2) and (a)(4), the court likewise DISMISSES 1720's § 727(a)(5) adversary complaint.

## IV. CONCLUSION

For all the reasons cited hereinabove, the court DENIES 1720's Motion to Dismiss pursuant to 11 U.S.C. § 707(a) and § 707(b).  The court DISMISSES 1720's adversary proceeding seeking to deny the debtor's discharge pursuant to 11 U.S.C. §§ 727(a)(2), 727(a)(4), and/or 727(a)(5).  The court instructs counsel for the debtor to prepare an order not inconsistent with this court's Memorandum within ten (10) days of entry of the Memorandum.

---

[10] The court also heard testimony about some stud earrings during the trial.  The debtor testified that she lost the earrings while performing sometime in 2006.  She explained how her entire band had searched in vain for the earrings following the show.  If 1720 was also relying on this testimony to support the § 727(a)(5) claims, it is to no avail.  The court found her testimony about the loss of this potential estate asset credible and unrebutted.

Case 3:09-ap-00226    Doc 25    Filed 11/24/09    Entered 11/24/09 09:52:19    Desc Main
Document      Page 16 of 16